1
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
2

3   ------------------------------------------------------------
                                    )
    United States of America,       )   File No. 19-CR-00005
4                                    )             (ECT/SER)
              Plaintiff,             )
5                                    )
    v.                               )   St. Paul, Minnesota
6                                    )   December 20, 2018
    Shawn Kelly Thomason,            )   10:18 a.m.
7                                    )
              Defendant.             )
8   ------------------------------------------------------------

9               BEFORE THE HONORABLE STEVEN E. RAU
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
10          **(TRANSCRIPTION OF AUDIO RECORDING OF**
                **PRELIMINARY/DETENTION HEARING)**

11
    **APPEARANCES**
12    **For the Plaintiff:**        **U.S. ATTORNEY'S OFFICE**
                                   **KATHARINE BUZICKY, AUSA**
13                                 300 S. 4th St., #600
                                   Minneapolis, Minnesota 55415
14
      **For the Defendant:**        **OFFICE OF THE FEDERAL DEFENDER**
15                                 **LISA LOPEZ, ESQ.**
                                   300 S. 4th St., #175
16                                 Minneapolis, Minnesota 55415

17    Transcribed by:              DEBRA K. BEAUVAIS, RPR-CRR
                                   300 S. 4th St., #1005
18                                 Minneapolis, Minnesota 55415

19

20

21

22       Proceedings recorded by mechanical stenography;
    transcript produced by computer.
23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

1   THE COURT:  We're here on the matter entitled

2   United States of America v. Shawn Kelly Thomason for our

3   preliminary hearing and a detention hearing.

4   Would counsel note their appearances for the

5   record.

6   MS. BUZICKY:  Good morning, Your Honor.  Katharine

7   Buzicky on behalf of the United States.  Special Agent Drew

8   Helms of the FBI is also present at counsel table.

9   THE COURT:  Good morning.

10   MS. LOPEZ:  Good morning, Your Honor.  Lisa Lopez

11   for Mr. Thomason, who is present before the Court.

12   THE COURT:  Good morning, Ms. Lopez.

13   Ms. Lopez, is the defendant still contesting

14   probable cause?

15   MS. LOPEZ:  Yes, Your Honor.

16   THE COURT:  Very well.

17   Will the government be offering a witness?

18   MS. BUZICKY:  Yes, Your Honor.  We have a witness

19   on the matter of probable cause and detention.  Based on our

20   preparation, I think that one direct examination would cover

21   both, if that works for the Court.

22   THE COURT:  Very well.  That's fine.

23   MS. BUZICKY:  All right.

1          THE COURT:  You may proceed.

2          MS. BUZICKY:  Yes, Your Honor.

3          Your Honor, before I begin, I'll just note that we

4     have 10 exhibits today.  They are photographs from various

5     search warrants associated with the case.  Prior to today's

6     hearing, I showed them to Ms. Lopez and gave her a sense of

7     what we have.  So just to make that clear so I don't have to

8     repeat just the fact that they were shown to the defense.

9          THE COURT:  Very well.

10          MS. BUZICKY:  The United States calls Special

11     Agent Drew Helms to the stand.

12          THE COURT:  Special Agent Helms, please approach

13     the witness stand.  Would you raise your right hand.

14          (Court administered oath to the witness.)

15          THE COURT:  Thank you.  Please be seated.  State

16     your name and spell your last name for the record, sir.

17          THE WITNESS:  Drew Helms, H-E-L-M-S.

18          THE COURT:  You may proceed.

19          MS. BUZICKY:  Yes, Your Honor.

20

21     **DREW HELMS**

22                          **DIRECT EXAMINATION**

23     **BY MS. BUZICKY:**

24     Q.  Good morning, Special Agent Helms.  You are an FBI

25     agent?

1    A.   Yes, I am.

2    Q.   And where are you assigned?

3    A.   To the Mankato resident agency office.

4    Q.   How long have you been an agent with the Federal Bureau

5    of Investigation?

6    A.   It was 23 years in October.

7    Q.   What types of cases do you investigate in Mankato?

8    A.   It's a small, two-person office.  We cover over the 200

9    violations of the federal rules, so white collar, violent

10   crime, bank robberies, that sort of thing.

11   Q.   In the course of your official duties, did you come

12   across an investigation of the defendant, Shawn Thomason?

13   A.   I did.

14   Q.   And you're the case agent for this case, correct?

15   A.   Yes, I am.

16   Q.   How did this matter first come to the FBI's attention?

17   A.   On December 7th, I was contacted by a patrol officer

18   with the Mankato Department of Public Safety.  He was a

19   former detective, and he and I worked together over the last

20   17 years that I was stationed in Mankato, and told me a

21   little bit about the case.  And he wondered if -- at the

22   point in time, they didn't know where the defendant was

23   located and wondered if he had possibly flown into

24   Minneapolis or Rochester and wondered if I could help try to

25   see if he did in fact fly.

1   Q.  So this was essentially a request for assistance,

2   correct?

3   A.  It was.

4   Q.  And as you started to learn a little bit more about the

5   investigation, what was the nature of the offense or the

6   offenses that the Mankato police were investigating?

7   A.  The defendant had traveled from Michigan and had placed

8   a GPS device or two on the victim's vehicle and had

9   confronted her at her home in Mankato.

10   Q.  As you learned more, did you start to believe that this

11   could potentially become a federal investigation as well?

12   A.  I did.

13   Q.  And as your preparation for today's hearing you've

14   reviewed reports written by your colleagues at Mankato P.D.

15   and other law-enforcement officers as well?

16   A.  Yes, I have.

17   Q.  So part of your testimony will be based on your review

18   of those reports and conversations with those officers,

19   correct?

20   A.  That's correct.

21   Q.  Okay.  So let's go a little bit into the details of this

22   investigation.

23          You stated that the Mankato police were looking at

24   potential travel across state lines and the placement of

25   tracking devices or GPS units on the victim's car.  What did

1    you learn about the relationship between the victim and the

2    defendant before all this got started?

3    A.   They had dated for approximately a year and a half, I

4    believe beginning in the fall of 2016, when they both lived

5    in Michigan.  The victim was attending college in the area,

6    and the defendant lived in Hazel Park, Michigan.  They had

7    broken up for a short period of time during that, but the

8    final break-up was in May of 2018.

9    Q.   Who ended the relationship?

10   A.   The victim did.

11   Q.   And how did the defendant, Mr. Thomason, react to the

12   termination of their romantic relationship?

13   A.   He sent many correspondence via email and social media

14   up until the point that the victim had to block him on all

15   of the social media accounts.  She did continue to see

16   correspondence from him, but it went automatically to a spam

17   folder so she didn't look at it until later.

18   Q.   After she ended the relationship in Michigan, did you

19   learn about any travel or vacations that she took?

20   A.   She did.  She finished school in May of '18 and had a

21   trip overseas, part of her degree, and she also had a summer

22   trip to a family member in Missouri during the summer of

23   2018.

24   Q.   And following that Missouri trip, where did the victim

25   end up residing?

1    A.  In August, she moved with her family members to

2    Minnesota and specifically to Mankato.

3    Q.  What did you learn about who she told or how public she

4    was about her move to Mankato?

5    A.  Based on ending the relationship and his continued

6    behaviors with her via electronic communications, she stated

7    that only four people knew where she was living in Mankato.

8    She had obtained a new cellular phone number that the

9    defendant did not have access to.  And there was just four

10   people that knew where she was living.

11   Q.  Now I'd like to draw your attention to the evening of

12   December 6, 2018.  What happened that day that caused law

13   enforcement to start looking into Mr. Thomason?

14   A.  The victim had got off work from her employment at a

15   local mall and had driven home the route that she had

16   normally taken, and when she pulled into her parking spot at

17   her residence -- it's kind of off of an alley, if you

18   will -- she noticed headlights coming off from a different

19   direction.  And that vehicle pulled in behind her when she

20   had parked, perpendicular to her car, blocking her car from

21   backing out or pulling away.

22   Q.  What happened after that?

23   A.  She waited to see what was happening.  She became very

24   uneasy and nervous with that car blocking her in.  She

25   thought she was going to be robbed.  Within a minute, the

1    defendant knocked on her window and attempted to open her

2    door by pulling on the car door.

3    Q.  How did she feel when she realized the defendant was

4    right outside her car window?

5    A.  She became frantic.  She immediately grabbed her cell

6    phone, called her father -- who was inside the house, within

7    30 feet of the parking spot -- and her father came out and

8    told the defendant to leave, said that law enforcement was

9    going to be called.

10   Q.  Did the defendant then leave?

11   A.  He did.

12   Q.  And the family, did they eventually get in touch with

13   law enforcement?

14   A.  Yes, they did.

15   Q.  What happened when they reported the incident to the

16   Mankato police?

17   A.  Initially, the patrol officers were interviewing her.

18   And, again, she told them that only a hand -- four people

19   knew that she was living there.  She wondered how he could

20   find her.  One of the patrol officers mentioned that there

21   are tracking devices that you can buy on Amazon.  They ended

22   up looking at her vehicle and found a relatively

23   new-appearing GPS tracker attached to the driver's side

24   vehicle frame.  And then upon closer inspection, an older

25   one was covered in dust and road salt from winter driving,

1    passenger side, again attached with magnets.

2    Q.  To that point, had she any idea that those devices were

3    attached to her vehicle?

4    A.  She did not.

5    Q.  And how did she react when she learned that those GPS

6    devices were under her car?

7    A.  It frightened her even further than the defendant's

8    behavior prior to that.

9    Q.  So based on that information and other investigation,

10   did Mankato police attempt to arrest the defendant?

11   A.  They did.  They had found out that he had rented a car

12   in Rochester, Minnesota, and they had gotten details about

13   that rental and put out a probable cause statement to the

14   surrounding law-enforcement agencies.

15   Q.  Did they eventually locate him in the vicinity?

16   A.  They did.  They arrested him outside a hotel in

17   St. Peter, Minnesota.

18   Q.  After the arrest, what steps did they take to interview

19   Mr. Thomason?

20   A.  He was brought to the jail and eventually interviewed by

21   one of the detectives, and his vehicle was towed in order to

22   apply for a search warrant.

23   Q.  What did he tell them about how he traveled from his

24   home in Michigan to Minnesota?

25   A.  He admitted to driving his personal car from Hazel Park,

1    Michigan to Rochester, Minnesota, renting a vehicle there,

2    and then driving to Mankato.

3    Q.  What about previous trips to Mankato in recent weeks?

4    A.  He was asked about the GPS device, and he had admitted

5    that prior to this immediate incident that he had traveled a

6    few weeks before and placed the first GPS on her vehicle.

7    Q.  And what was his stated reason for being in Mankato?

8    A.  He wanted to see why the victim found the town

9    enjoyable, wanted to check up on her, and --

10             THE COURT:  Why the victim found the town what?

11             THE WITNESS:  Enjoyable.

12             THE COURT:  Okay.

13             THE WITNESS:  There had been some communication

14   about him coming or wanting her to, obviously, come back to

15   Michigan.

16   BY MS. BUZICKY:

17   Q.  Now, you mentioned that his vehicle was also seized by

18   law enforcement.  Did they obtain a search warrant to look

19   at the interior of that vehicle?

20   A.  Yes, they did.

21   Q.  And, again, here we're talking about the rental car,

22   correct?

23   A.  That's correct.

24   Q.  Okay.  I'm going to hand you Government Exhibits 1

25   through 7, and I'd like you to just identify what these are

1    for the record.

2    A.   These are pictures taken by the Mankato Department of

3    Public Safety during the execution of their search warrant

4    when the detectives who was searching the car and then their

5    crime scene person was taking pictures.

6    Q.   And are these true and accurate copies of those photos?

7    A.   Yes, they are.

8              MS. BUZICKY:  Your Honor, we offer Government

9    Exhibits 1 through 7 into evidence.

10             MS. LOPEZ:  No objection.

11             THE COURT:  It will be admitted.

12   BY MS. BUZICKY:

13   Q.   So, Special Agent Helms, starting with Government

14   Exhibit 1, what does that photo depict?

15   A.   This depicts two what appear to be homemade faraday

16   bags.

17   Q.   And describe what a faraday bag is based on your

18   training and experience.

19   A.   It's a bag that you can either make yourself or purchase

20   commercially available and it blocks radio-frequency signals

21   from outgoing or incoming when a device is placed inside the

22   faraday bag.

23   Q.   What did the defendant tell the Mankato authorities

24   about why he had these faraday bags?

25   A.   That he didn't want to be tracked by the government.

1    Q.  Looking at Government Exhibit 2, what does that depict?

2    A.  An overall shot of the trunk of the rental vehicle; it

3    was a Nissan Murano.  Just the various bags and the cooler

4    as they were found.

5    Q.  And what did those bags depict just generally -- or,

6    excuse me, contain just generally speaking?

7    A.  Some of the bags, clothing items.  The cooler had food,

8    MREs (military ready to eat), drinks, chips, snacks.

9    Clothing items.  There was a handgun in there, a stun gun,

10   some electrical tape, a camera, recording devices.

11   Q.  Taking a look at Government Exhibit 3, what does that

12   depict?

13   A.  That's the stun gun that was found in the vehicle.

14   Q.  Within the rental vehicle?

15   A.  Yes.

16   Q.  And Government Exhibit 4?

17   A.  That's an electrical tape that was found in the -- in

18   the vehicle as well.

19   Q.  Government Exhibit 5?

20   A.  This is a Glock pistol that was contained in a shoulder

21   holster within the back of the vehicle.

22   Q.  Now, thinking about that Glock a little bit in more

23   detail, what did you learn about whether the defendant had

24   been a gun owner prior to this fall?

25   A.  He had not, according to the victim, ever owned a

1    firearm prior to the fall of 2018.

2    Q.  And based on the evidence that you have reviewed, about

3    when did he obtain that weapon and a permit to carry it?

4    A.  That gun was purchased about the second week in November

5    of this -- 2018.

6    Q.  Taking a look at Government Exhibit 6, what does that

7    depict?

8    A.  The contents of the cooler that were found in the back

9    of the vehicle.

10    Q.  And you mentioned military rations.  Are those in that

11    picture as well?

12    A.  Yeah.  They are the brown, plastic bags on the right.

13    Q.  Okay.  And, finally, Government Exhibit 7, what is that?

14    A.  It depicts a picture of a ring that was found with a

15    note attached to it that was found in the back of the

16    vehicle as well.

17    Q.  And if you were to characterize what kind of ring that

18    is, what would you say?

19    A.  Like a promise ring or an engagement ring.

20    Q.  And the text of the note may not be fully visible, but

21    what is it generally conveying?

22    A.  That he wanted the victim to accept the gift, the ring,

23    and kind of laid out his course of action on behaviors for

24    their continuing relationship.

25    Q.  So some sort of promise or engagement ring and a note

1    talking about a future together or something like that?

2    A.   That's correct.

3    Q.   Okay.  Now, you testified that you started thinking

4    about this case as a potential federal investigation.  At

5    some point, did you attempt to obtain a search warrant for

6    the defendant's home in Michigan?

7    A.   We did, yes.

8    Q.   And who actually executed that search warrant?

9    A.   Agents and task force officers from our Detroit office.

10   Q.   When did that search warrant get executed?

11   A.   On Wednesday.

12   Q.   Wednesday of this past week?

13   A.   This past week, yes.

14   Q.   Okay.  And at the time that the search warrant was being

15   presented to the magistrate and so forth, where was the

16   defendant?

17   A.   He was in custody at the Blue Earth County Jail, but he

18   was in the process of bonding out.

19   Q.   What did the agents and task force officers in Michigan

20   discover when they got into the defendant's home in

21   Michigan?

22   A.   More electronic tracking devices, a second pistol, a

23   lock-picking kit, and both a typewritten and a handwritten

24   note about tactics and kind of a planning checklist.

25   Q.   I'm going to show you Government Exhibits 8 through 10.

1    Can you identify those three exhibits for the record?

2    A.  These depict images from -- the typewritten note as

3    Government Exhibit 8, and the two-page handwritten note of

4    Government Exhibit 9 and 10.

5    Q.  Where were those found?

6    A.  Eight was in one of the rooms.  And nine and ten were in

7    a trash can in one of the rooms at the house in Michigan.

8    Q.  So all in the defendant's home in Michigan?

9    A.  That's correct.

10   Q.  And are those true and accurate copies of those

11   pictures?

12   A.  I think they are cropped a little bit differently just

13   the way they printed it out, but, yes, they are of what was

14   found.  Yes.

15   Q.  Understood.

16           MS. BUZICKY:  Your Honor, we offer Government

17   Exhibits 8 through 10.

18           THE COURT:  Ms. Lopez?

19           MS. LOPEZ:  No objection.

20           THE COURT:  It will be received.

21   BY MS. BUZICKY:

22   Q.  Taking a look at Government Exhibit 8, the typewritten

23   note as you described it, what does that contain, what kind

24   of information?

25   A.  It appears to be a checklist with some things crossed

1   out by line.  Many of those things were actually found in

2   the rental car at the search warrant -- time of the search

3   warrant.

4   Q.  So can you read off some of the items that are on that

5   list, just a selection.

6   A.  Phones, money, cards, tac pants, belts, compression

7   gear, gloves, straps, cuffs, duct tape, electrical tape,

8   gifts, Dynamat.

9               THE COURT:  I'm sorry, what was that last one?

10              THE WITNESS:  Something called Dynamat.

11              THE COURT:  What's that?

12              THE WITNESS:  I had to Google it myself, Your

13  Honor.  At least according to my open source search --

14              THE COURT:  GTS.

15              THE WITNESS:  Yes.  It's a sound-dampening product

16  used in either vehicles or commercial or residential that

17  you can put up in walls to make things quieter.

18  BY MS. BUZICKY:

19  Q.  So based on your research, that's the product that would

20  muffle sounds?

21  A.  That's correct.

22  Q.  And then taking a look at 9 and 10, a little bit harder

23  to read, but what kind of information did they generally

24  contain?

25  A.  Some of the items that are on 9 and 10 handwritten

1    appear on the other exhibit as well.

2    Q.  Get your cheaters out.

3    A.  Maybe put my cheaters on.

4            Prepaid cards, phones, gloves.  Some items have

5    check marks next to them.  Something about counting the

6    seconds, using the spark plug to break windows.  Again,

7    there is more of a list --

8            THE COURT:  Using a what?

9            THE WITNESS:  A spark plug to break windows.

10   BY MS. BUZICKY:

11   Q.  So items like a packing list and then potential tactics

12   or actions to take --

13   A.  Yes.

14   Q.  -- would be a fair summary?

15   A.  That's correct.

16   Q.  Okay.  As the agents and task force officers in Detroit

17   were executing their search warrant, were they communicating

18   with you in Mankato?

19   A.  Yes, they were.

20   Q.  What did they convey to you about the urgency of the

21   situation?

22   A.  Based on, you know, what they had found with the gun,

23   the lock-picking kit, other tracking appearing electronics

24   at the house, and then with these two -- both the

25   handwritten note and the later checklist, it made it more

1    urgent or threatening that there was more to a visit to

2    Mankato than just to check out how the town was.

3    Q.  Based on what they told you and your own investigation

4    of this case, what did you decide to do that evening?

5    A.  To pursue an arrest warrant for the defendant.

6    Q.  A federal --

7    A.  A federal arrest warrant.

8    Q.  And can you describe the circumstances under which he

9    was arrested.

10   A.  After he had bonded out of Blue Earth County Jail, they

11   had -- one of the conditions was a GPS unit be placed on his

12   ankle.

13        Through Blue Earth County probation and the

14   third-party monitoring company, they gave me realtime

15   updates as far as his location when he was leaving Mankato

16   and heading east towards Rochester, Minnesota.  I related --

17   relayed that information to the special agent in Rochester

18   who was working with the Rochester Police Department, and

19   they eventually located him in a McDonald's in Rochester,

20   Minnesota and placed him under arrest.

21   Q.  Now, since he has entered federal custody, did you have

22   an opportunity to talk to the victim in this case?

23   A.  Yes.

24   Q.  And what is her sense or feelings about the

25   dangerousness or course of action that this defendant may

1    take?

2              MS. LOPEZ:  Objection, relevance.

3              THE COURT:  It will be overruled.

4              THE WITNESS:  She's extremely fearful.  She talked

5    about him not giving up and continuing to pursue whatever it

6    was that he wanted to pursue with this incident.

7    BY MS. BUZICKY:

8    Q.  And how did she describe his mind-set or approach to

9    issues like this?

10   A.  He is very controlling, and he would never give up.

11   Q.  As a part of your investigation, have you looked into

12   how the defendant was able to bond out of Blue Earth County?

13   A.  Yes.

14   Q.  And what did you learn about who provided the funds for

15   that?

16   A.  The defendant has a -- what appears to be a very close

17   friend from Michigan that has seemingly unlimited access to

18   money.  This third-party friend is the one that posted the

19   $25,000 bond and, at least through what I've learned so far,

20   likely paid for the vehicle that he drove, his personal

21   vehicle, and his house.

22   Q.  Based on your training and experience as a

23   law-enforcement officer, what are some of your concerns

24   about that dynamic, where the defendant has access to large

25   amounts of money and funds?

1    A.  It could be used not only to re-attempt contact with the

2    victim but be used to flee and not come back to face the

3    charges.

4             MS. BUZICKY:  Your Honor, no further questions for

5    this witness.

6             THE COURT:  Thank you.

7             Ms. Lopez.

8             MS. LOPEZ:  Thank you, Your Honor.

9

10                    **CROSS-EXAMINATION**

11   **BY MS. LOPEZ:**

12   Q.  Agent Helms, you testified that there were two trackers

13   that were found under this car?

14   A.  That's correct.

15   Q.  And this particular car is a 2017 Chevy Cruze, correct?

16   A.  Yes.

17   Q.  And you --

18   A.  To the best of my knowledge.  I don't know exactly what

19   year it is, but yes.

20   Q.  Okay.  And you testified that in the course of your

21   investigation in this case, you read some of Mr. Thomason's

22   writings?

23   A.  That's correct.

24   Q.  And he referred to having purchased this car for

25   Ms. Schraeder?

1    A.  By the third party, yes.

2    Q.  Yes.  But he -- and the Complaint actually says that,

3    right?  It says that he gifted that car to her?

4    A.  That's correct.

5    Q.  Okay.  Now, in terms of the tracker, one was found on

6    the passenger side?

7    A.  Yes.

8    Q.  And one was found on the driver's side?

9    A.  That's correct.

10   Q.  And it's believed that the passenger side tracker had

11   been on there for a longer period than the one on the

12   driver's side?

13   A.  That's correct.

14   Q.  A matter of weeks?

15   A.  An unknown period of time.  It was covered in dust and

16   road grime.  We did have a lot of snow in between there and

17   salt on the roads and that sort of thing.  So the couple of

18   weeks was based on his statement to the detective during the

19   interview.

20   Q.  Okay.  And is it your understanding that that was placed

21   on there on a previous trip of his to Minnesota?

22   A.  That's correct.

23   Q.  Okay.  Now, of the two suspected trips at least, it's

24   only this trip that she claims that Mr. Thomason had any

25   physical contact with her?

1    A.   That's correct.

2    Q.   And, in fact, in this alleged previous trip there was no

3    contact of any kind?

4    A.   That's what she reported, yes.

5    Q.   Okay.  And as to both trips, she didn't report that she

6    was being followed by any suspicious cars on her way to and

7    from work?

8    A.   That's correct.

9    Q.   She didn't report that somebody was sitting outside of

10   the mall sort of after closing hours and confronting her

11   while she was alone?

12   A.   That's correct.

13   Q.   Okay.  And going back to my questions about the car that

14   he claims to have gifted her -- and that's written as such

15   in the Complaint -- so that would be that he placed the GPS

16   on what he views as his car or as a car that he had given to

17   her as a gift?

18   A.   Even though it's titled in her name, yes.

19   Q.   Correct.  But that money came from Mr. Thomason or

20   Mr. Thomason's contacts?

21   A.   Yes.

22   Q.   So let's talk about the encounter that you described on

23   December 6th.  Okay?  And Ms. Schraeder, she was working at

24   the mall on that date?

25   A.   Yes, she was.

1   Q.  And she said that her store closes at 9:00 p.m.?

2   A.  Yes.

3   Q.  She drove home after that?

4   A.  Yes.

5   Q.  And it was at that point that she parked in a driveway,

6   but it was off of an alley, correct?

7   A.  That's correct.

8   Q.  And Mr. Thomason pulled up sort of perpendicular to her

9   car?

10  A.  And behind it.

11  Q.  And behind it?

12  A.  Yes, ma'am.

13  Q.  And that would have been really one of the only places

14  in the alley, right?  Like if he wanted to stop right in

15  front of her house, that would have been the place, not in

16  the middle of the alley?

17  A.  Minnesota Valley Pet Hospital is right next, across the

18  alley if you will.  There was lots of parking spaces there

19  I'm sure, so he could have pulled into a parking spot.

20  Q.  Okay.  And when he -- when Mr. Thomason got out of his

21  car, he walked up to her driver's side window?

22  A.  That's correct.

23  Q.  And what she reports is that he knocked on her window?

24  A.  Pulled on the door handle and then knocked on the

25  window.

1    Q.  And knocked on the window.

2              She didn't report that he banged on the window?

3    A.  No.

4    Q.  And she stated that she didn't make eye contact with him

5    and called her father?

6    A.  That's correct.

7    Q.  And at that point, he didn't get -- Mr. Thomason didn't

8    get aggressive that she wasn't talking to him?

9    A.  That's correct.

10   Q.  He didn't threaten her?  Didn't raise his voice?

11   A.  That's correct.

12   Q.  Okay.  And, in fact, how she describes him is she

13   described him as being "friendly"?

14   A.  That's how she described it.

15   Q.  Okay.  During that incident, she never reports that he

16   told her he had a gun?

17   A.  No.

18   Q.  He never threatened her with a gun?

19   A.  No.

20   Q.  And she didn't even report seeing a gun on his person?

21   A.  It -- she did not.

22   Q.  Okay.  Instead, what she said he had in his hands was a

23   paper envelope?

24   A.  That's correct.

25   Q.  And in that paper envelope were writings that contained

1    questions about sort of the status of their relationship and

2    why she left him, things like that?

3    A.  I'm not sure what that envelope had in it, but there

4    were those types of writings, questions, script if you will,

5    found in the vehicle.  So I'm not sure what was found in the

6    envelope at the immediate time when he had it in his hand.

7    Q.  Okay.  And so Ms. Schraeder, like I said, called her

8    father.  He came out of the house; is that correct?

9    A.  That's correct.

10   Q.  And he told Mr. Thomason to leave?

11   A.  He did.

12   Q.  And Mr. Thomason left?

13   A.  Yes.

14   Q.  Without incident?

15   A.  Yes.

16   Q.  Didn't fight him?

17   A.  Got into his car and drove away.

18   Q.  Didn't fight the father?

19   A.  No.

20   Q.  Didn't resist?

21   A.  No.

22   Q.  Didn't call him names?

23   A.  Not that I'm aware of.

24   Q.  Didn't say he'll be back?

25   A.  Not that I'm aware of, no.

1    Q.  Okay.  And, in fact, there are no reports that

2    Mr. Thomason came back?

3    A.  Nope, there's not.

4    Q.  There's no reports that he was seen circling their

5    block?

6    A.  No.  He wasn't apprehended until later the next morning.

7    Q.  Exactly.  And so he was arrested the next morning,

8    correct?

9    A.  That's correct.

10   Q.  And where he was arrested, it was in St. Peter?

11   A.  That's correct.

12   Q.  And that's about 15 miles north of Mankato?

13   A.  Of Mankato, yeah.  Yes.

14   Q.  Approximately 15 minutes away?

15   A.  Yes.

16   Q.  Okay.  And at that point, he had already checked out of

17   that hotel?

18   A.  According to the detective from St. Peter, yes.  They

19   found him in his vehicle running outside the hotel, and that

20   when they did check with the management there, they said,

21   yes, he's already checked out.

22   Q.  And so all of his items were in his car?

23   A.  That's correct.

24   Q.  So he was leaving?

25   A.  He was leaving the hotel, yes.

1   Q.  Okay.  And when he was arrested by local authorities,

2   that was again without incident?

3   A.  That's correct.

4   Q.  He didn't fight with officers?

5   A.  Did not.

6   Q.  Didn't become belligerent with them?

7   A.  Did not.

8   Q.  Okay.  And, in fact, he told the officers that he had a

9   gun in his car?

10   A.  That's correct.

11   Q.  He didn't hide that?

12   A.  He did not.

13   Q.  Didn't deny it?

14   A.  No.

15   Q.  And it's legal for Mr. Thomason to have a gun?

16   A.  To be honest, I don't know what the State of Minnesota

17   laws are when it comes to reciprocity for conceal-carry, but

18   I would imagine that just the mere possession of the firearm

19   as a non-convicted felon or domestic violence type of issue

20   is -- it's legal.

21   Q.  And, in fact, as part of the discovery that's been

22   disclosed to me, you may have seen this, he had a purchase

23   -- a document that evidences that he purchased it through an

24   authorized dealer?

25   A.  It appears so, yes.

1    Q.  And in the top corner of that document it says,

2    "Michigan State Police"?

3    A.  Probably so.  That's who issues permit to purchases in

4    most states or the local jurisdiction in the sheriff's

5    office.

6    Q.  So at least in Michigan, he was able to buy that

7    legally?

8    A.  Yes.

9    Q.  Okay.  Now, on the issue of the gun, you talked about

10   that a little bit on direct.  Mr. Thomason owns two guns?

11   A.  Okay.

12   Q.  Is that correct?  There's one in --

13   A.  Two guns were found.

14   Q.  Correct.  So two guns were found; is that right?

15   A.  Yes.

16   Q.  One in Michigan.  One in Minnesota.  And it's the

17   Minnesota one that you're saying was purchased in November?

18   A.  I was just going off by what one of the reports had said

19   about the Glock being purchased in November.  I'm not sure

20   when he pursued the whole permit to purchase, and I don't

21   know what the time frame is as far as receipt, background,

22   and issuing of a permit to purchase in Michigan.

23   Q.  Let me ask a different question.  One of those guns was

24   purchased in November?

25   A.  As far as I know, yes.

1     Q.  Do you know when the other gun was purchased?

2     A.  No, I do not.

3     Q.  So it could've been months ago?

4     A.  It could've been.  Certainly.

5     Q.  Okay.  It could've been well before the two of them

6     broke up and Ms. Schraeder just didn't know about that?

7     A.  It certainly could've been, yes.

8     Q.  Okay.  And you indicated that he has a conceal and carry

9     permit; is that right?

10    A.  That's correct.

11    Q.  Okay.  And are you aware that he originally obtained

12    that permit back in 2010?

13    A.  Was not aware.

14    Q.  And are you aware that all he did in August was update

15    that permit?

16    A.  Was not aware.

17    Q.  Okay.  Agent, there's no reports that Mr. Thomason used

18    either gun in any illegal manner here or in Michigan?

19    A.  That's correct.

20    Q.  Okay.  And, again, there is no evidence that

21    Mr. Thomason ever made Ms. Schraeder aware that he had a

22    gun?

23    A.  That's correct.

24    Q.  So to say it a different way, he didn't try to use a gun

25    to intimidate her?

1    A.  On December 6th that's correct, yes.

2    Q.  Was there another date that he used a gun to intimidate

3    her?

4    A.  No, but that was the only interaction that they had.

5    Q.  Okay.  And no evidence that he ever even wore it to sort

6    of show her and intimidate her that he had a gun?

7    A.  No.

8    Q.  Now, you discussed some of the items that were found in

9    Mr. Thomason's car.  Do you remember doing that?

10   A.  Yes, ma'am.

11   Q.  And one of the items that you talked about was that he

12   had some gifts for her.

13   A.  That's correct.

14   Q.  And those items were two wrapped books?

15   A.  That's correct.

16   Q.  And presumably those are for her to read?

17   A.  They were two wrapped books and they were wrapped as

18   gifts, yes.

19   Q.  Okay.  And you testified that there was also a ring?

20   A.  That's correct.

21   Q.  Presumably for her to wear?

22   A.  Again, I would presume that, yes.

23   Q.  Okay.  And you talked about this note, but you said that

24   you couldn't exactly read it there.  You kind of summarized

25   what it said.

```
 1    A.  Yes.

 2    Q.  Okay.

 3    A.  Would you like me to read it?

 4    Q.  I actually have it here, so I'll just ask you to verify

 5    that this is what it says.

 6    A.  Okay.

 7    Q.  So the note says, Please accept this ring as a promise

 8    to do right by you; is that correct?

 9    A.  To always do right by you.

10    Q.  To always do right by you.

11          To never forget and become complacent?

12    A.  That's correct.

13    Q.  To always put your needs and happiness above my own?

14    A.  That's correct.

15    Q.  To be there for you?

16    A.  Yes.

17    Q.  To always love, honor, and cherish you?

18    A.  I believe -- I couldn't see those words on my image, but

19    I do recall reading them through one of the reports.

20    Q.  Exactly.  And that's where I get it from.

21    A.  Yes.

22    Q.  Mr. Thomason didn't include any threats in there?

23    A.  No.

24    Q.  No curse words?

25    A.  No.  It was a very nice note.
```

1    Q.  No name calling?

2    A.  No.

3    Q.  In fact, what he's doing in that note is promising to

4    never hurt her?

5    A.  I don't know if I'd answer affirmatively to that, but

6    he's promising to be a better boyfriend, apparently.

7    Q.  And to put her needs and happiness above his own?

8    A.  Yes.

9    Q.  And to love, honor, and cherish her?

10   A.  Yes.

11   Q.  Now, Agent, you also talked about some other writings

12   that you found during the course of this investigation.

13   A.  That the other officers did, yes.

14   Q.  And have you read those yourself?

15   A.  No, I have not yet.

16   Q.  Okay.

17   A.  I'm just going off of the summary reports from Mankato

18   Department of Public Safety.

19   Q.  So just making sure that I understand this correctly,

20   others read these letters and sort of reported to you a

21   summary of what they said?

22   A.  That's correct.

23   Q.  Okay.

24   A.  Some of the highlights.

25   Q.  Is it your understanding that there is approximately 20

1    pages of these writings?

2    A.  I don't know for certain.  I believe that in the

3    detective's report he said there was a stack of papers,

4    documents, that sort of thing.

5    Q.  A lot of documents?

6    A.  A lot.

7    Q.  Okay.  And some of them were handwritten?

8    A.  Yes.

9    Q.  Some of them were typed?

10   A.  Yes.

11   Q.  And when it was typed, it was typed single space?

12   A.  I don't recall.  I haven't seen any of these documents,

13   so I couldn't say one way or the other whether they were

14   single or double-spaced, other than this one that was found

15   in Detroit.  I haven't seen any out of the car.

16   Q.  Do you have any reason to disagree with me that they are

17   single-spaced?

18   A.  No.

19   Q.  If I showed you just --

20   A.  Do you have -- do you have these documents?

21   Q.  Yes.

22   A.  I've seen that, yes.  That's single-spaced.  It appears

23   to be from an email message.

24   Q.  Okay.  And so my question about that is, there's

25   basically a lot of writing within these many documents?

```
 1    A.  Yes.
 2    Q.  Okay.  And the Complaint lists just three or so of these
 3    short excerpts, even though there's much more writing?
 4    A.  Yes.
 5    Q.  Okay.  But sort of to summarize all of the writings,
 6    without going in depth on each of them, he never writes I'm
 7    going to kill you?
 8    A.  I -- I don't believe so.
 9    Q.  You think that other officers who were investigating
10    this case, they probably would have told you if --
11    A.  If it would have been that overt, yes.
12    Q.  Okay.
13    A.  Yeah.
14    Q.  Never said I'm going to hurt you?
15    A.  Not those words.
16    Q.  Never said I hate you?
17    A.  Not that I'm aware of.
18    Q.  The writings are not riddled with curse words?
19    A.  Not that I recall.
20    Q.  Or with name calling?
21    A.  I don't recall.  And, again, I haven't been through the
22    entire volume of things that were found in his car to date.
23    Q.  So let me ask it way:  Did you get any reports from the
24    other officers in the case that he had written these notes
25    and that they included him calling her names?
```

1   A.  Not that I recall, no.

2   Q.  Okay.  In fact, what these letters -- what these

3   writings include is Mr. Thomason asking her to go to couples

4   counseling?

5   A.  There was mention of that in one of these notes.  I'm

6   not really comfortable giving specifics, unless you want to

7   hand me some of them and I can re-read them to refresh my

8   recollection, but --

9   Q.  I'll just ask you about what you're aware of.  Okay?

10          So are you aware that in these writings he

11   expressed regret for his actions?

12   A.  Again, I haven't been through them all.  The ones that

13   were highlighted in the Complaint -- or affidavit, I don't

14   recall that he was expressing his regret.

15   Q.  Okay.  Are you aware that within those writings he

16   talked about how hard their break-up was on him?

17   A.  Yes.

18   Q.  Are you aware that in his writings he had a lot of

19   questions for Ms. Schraeder?

20   A.  He did, yes.

21   Q.  And are you aware that in his writings the -- he says

22   that he was broken up with via text -- via text message?

23   A.  I believe so.  Yes.

24   Q.  Okay.  Are you aware that in these writings he's asking

25   her why she continues to accept his financial help and yet

1    sort of not -- sort of ignore him?

2    A.  Those were some of the statements on one of the

3    documents that were found in kind of the script sort of

4    manner.

5    Q.  Yes.  And discussing the financial help in particular,

6    that included him paying for her credit cards?

7    A.  I don't know.  I know that this friend gave them both an

8    American Express Gold card.  And I believe that there was

9    some writings about she was using that card and that when he

10   -- you know, talking about it really wasn't hers to use.

11   Q.  Okay.  Are you aware that in these writings Mr. Thomason

12   references that he purchased a flight back for her from

13   Europe back to Detroit?

14   A.  I seem to recall there was some mention of that in all

15   of these reports.  I just don't have the specifics.

16   Q.  And he also included that the financial help entailed

17   buying her a $20,000 car fairly recently?

18   A.  That was part of his script, yes.

19   Q.  Okay.  And he indicated in his writings that he believed

20   that her accepting these items meant that they were

21   continuing on in their relationship?

22   A.  And it obligated her to honor her commitments, yes.

23   Q.  Now, you talked about Mr. Thomason bonding out of a

24   local jail.

25   A.  Blue Earth County Jail, yes, ma'am.

1    Q.  And he used a bail bondsman; is that right?

2    A.  Yes.

3    Q.  And that bondsman's name is Rick Miller?

4    A.  Yes.

5    Q.  And Rick Miller after Mr. Thomason was released drove

6    Mr. Thomason to the police station to pick up his keys?

7    A.  That's correct.

8    Q.  And Mr. Thomason asked Mr. Miller to drive in a way that

9    avoided Ms. Schraeder's address?

10   A.  As they were going down Madison Avenue hill, when I

11   spoke to the bondsman, the defendant did say can you go a

12   different way.  The bondsman followed up that does she live,

13   you know, on the corner?  And he said that, no, she lives

14   away from there but still wanted to go a different path.

15   Q.  So Mr. Thomason was trying to avoid Ms. Schraeder's

16   address, and Mr. Miller stated that Madison Avenue is sort

17   of a throughway and that's the way that they have to go to

18   get to the police station, something to that effect?

19   A.  To that effect, yes.

20   Q.  Okay.  And at that point, one of the conditions that he

21   had been released on was a no-contact order --

22   A.  That's correct.

23   Q.  -- with her, and to stay away from that address as well?

24   A.  Yes.  I think there was a half mile radius.

25   Q.  Okay.  Now let's move to the federal arrest in this

1    case.  Mr. Thomason was arrested federally just hours after

2    posting bond in state court; is that right?

3    A.  That's correct.

4    Q.  Okay.  And when he was arrested, he was arrested in

5    Rochester?

6    A.  Yes.

7    Q.  Ms. Schraeder lives in Mankato?

8    A.  Yes.

9    Q.  And Mankato is about one-and-a-half hours west of

10   Rochester?

11   A.  Yes, it is.

12   Q.  And so he was not in Mankato any longer at that point?

13   A.  That's correct.

14   Q.  And, in fact, if you sort of follow that route, it was

15   Mankato where Ms. Schraeder lives, correct?

16   A.  Yes.

17   Q.  Go an hour and a half east and that's where Mr. Thomason

18   was; is that correct?

19   A.  That's correct.

20   Q.  And if you continue going farther, you would get to

21   Michigan?

22   A.  Yes.

23   Q.  Okay.  So it's very possible that Mr. Thomason was on

24   his way out of town at that point?

25   A.  It's very possible.

1    Q.  Okay.  Now, you testified that he was arrested and you

2    were able to locate him because of his GPS bracelet?

3    A.  That's correct.

4    Q.  So in those few hours after his release, it seems like

5    he was complying with the court's order and wearing that GPS

6    as directed?

7    A.  Yes.

8    Q.  And that GPS worked as it should?  You were able to

9    locate him in realtime?

10   A.  For a few minutes we lost track of it, but, yes, it did

11   work for the most part.

12   Q.  Okay.  And when Mr. Thomason was arrested, that was at

13   McDonald's?

14   A.  Yes.

15   Q.  He was eating an ice cream?

16   A.  I believe he did have an ice cream cone when he came out

17   of the McDonald's and was placed under arrest.

18   Q.  And, again, when he was arrested by federal agents, just

19   hours after paying $25,000 bond and another $1,300 to get

20   the GPS bracelet on, correct?

21   A.  I don't know what the financial -- I know there was an

22   extra cost because they had to get a different GPS unit that

23   would work in Michigan.

24   Q.  Okay.  So despite that, he was arrested federally.  And

25   he was not belligerent during that arrest?

1    A.  That's correct.

2    Q.  Didn't resist?

3    A.  Did not.

4    Q.  Okay.  And officers searched his car at that point?

5    A.  I don't believe they did.  I think they left it there

6    and had the rental company come and pick it up the next day.

7    Q.  If I told you one of the police who conducted that

8    arrest or one of the law-enforcement agents that conducted

9    that arrest noted he had no illegal narcotics or drug

10   paraphernalia in the car, do you have any reason to disagree

11   with that?

12   A.  No.  I believe there was an odd smell and they ran a dog

13   around the car.  Yeah.

14   Q.  All right.  Now let's talk about the search warrant

15   executed in Michigan.  Do you remember testifying about

16   that?

17   A.  Yes, ma'am.

18   Q.  Okay.  And you stated that agents called you from there

19   and sort of said that the situation was more urgent because

20   of what they found?

21   A.  That's correct.

22   Q.  Now, you believe that those items that were in his house

23   -- you believe that Mr. Thomason is the one who's

24   responsible for them being there?

25   A.  To my understanding, he's the only one that lives there.

1    Yes.

2    Q.  Okay.  And so he would have procured those items prior

3    to coming to Minnesota?

4    A.  Of course.  Yes.

5    Q.  Under your suspicion that he bought these items?

6    A.  That's correct.

7    Q.  And when he came to Minnesota, he didn't bring any of

8    those items?

9    A.  Not the ones that were found in Michigan, no.

10   Q.  So if he didn't bring them to Minnesota, he probably

11   didn't intend to use them in Minnesota; is that right?

12   A.  I don't know what his intentions were, nor can I answer

13   that.

14   Q.  Okay.  Agent, you testified about this Dynamat, and I

15   didn't know what that was either.  Did he have that with

16   him?

17   A.  Did not.  No.  Did not in the rental car.

18   Q.  So it was on the piece of paper but not in his

19   possession?

20   A.  That's correct.

21   Q.  Agent, you testified about some trips that were taken

22   over the summer.  Do you recall that?

23   A.  That the victim took?

24   Q.  Yes.  I'm sorry.

25   A.  Yes.

1   Q.  And one of those was she went to Missouri?

2   A.  That's correct.

3   Q.  And then after that she spent the rest of the summer in

4   Europe?

5   A.  That's correct.

6   Q.  And we've already talked about that those --

7   Mr. Thomason's writing seems to suggest that the two were in

8   contact while she was in Europe?

9   A.  I've not been able to analyze all the email

10  correspondence yet, but that's something I plan on doing.

11  Yes.

12  Q.  But your understanding is that Mr. Thomason paid for a

13  flight from Moscow to Detroit?

14  A.  I -- I honestly can't answer who paid for what in that

15  type of specific detail at this point in time because none

16  of the electronics had gone through --

17  Q.  Let me ask more generally.  In the writings you've

18  already testified that there was a reference to Mr. Thomason

19  buying her a flight from Europe to Detroit -- or to the

20  States?

21  A.  I believe there was something about buying a flight,

22  yes.  Again, the details from Russia to Europe, I think it

23  was something to get her back or pay for it in some manner.

24  Yes.

25  Q.  Okay.  And are you aware of any other trip that she took

1    to Europe, besides the summer?

2    A.  Not that I'm aware of, no.

3    Q.  Okay.  And so the flight back from that trip, since she

4    spent the summer there, would have been at the end of the

5    summer?

6    A.  I don't have the timeline down.  I believe, you know, if

7    graduation was in May, you know, and the trip I think was

8    before the trip to Europe, and I think part of the trip to

9    Europe was part of her -- her degree studies, and then they

10   moved in August.  So, yeah, I would imagine the trip was

11   June or July.

12   Q.  Okay.  Agent, you've not seen the receipt for that

13   flight, have you?

14   A.  I have not.

15   Q.  Okay.  I'll proffer that later.

16            MS. LOPEZ:  Your Honor, may I have a moment?

17            THE COURT:  You may.

18            MS. LOPEZ:  Thank you.

19            THE COURT:  Take your time.

20            (Pause)

21            MS. LOPEZ:  I have nothing further.  Thank you.

22            THE COURT:  Thank you.

23            MS. BUZICKY:  Your Honor, if I may ask a few brief

24   questions?

25            THE COURT:  You may.

1

2                         **REDIRECT EXAMINATION**

3    **BY MS. BUZICKY:**

4    Q.  Special Agent Helms, you mentioned that the defendant

5    was apprehended in Rochester.  And just so the record is

6    clear, why was he traveling to Rochester?  How did that fit

7    into his interstate travel?

8    A.  His personal vehicle was left at the rental location

9    that he got the vehicle from to come to Mankato, so his

10   personal vehicle was back in Rochester.

11   Q.  So just to clarify, he drove from Michigan to Rochester,

12   rented a vehicle, and then took that rental vehicle to

13   Mankato?

14   A.  That's correct.

15   Q.  And for his previous trip what did you learn about a

16   similar course of action?

17   A.  That he had driven again from Michigan to Edina,

18   Minnesota and rented a car in Edina, Minnesota before

19   driving down to Mankato to place the first GPS device on her

20   vehicle.

21   Q.  There was a question about drugs in the vehicle that was

22   located in Minnesota.  What did you learn about potential

23   evidence of narcotics in the Michigan home?

24   A.  That there were an unknown quantity or an ounce or

25   something of pills there that were unknown at the time, but

1    also cocaine and methamphetamine was found in the

2    defendant's home.

3    Q.   Now, you've been asked a number of questions and very

4    detailed questions about documents and investigations, so

5    forth.  How would you characterize the status of your

6    investigation right now, as we sit here today?

7    A.   It's ongoing and it's very early in the stages of the

8    totality of the investigation.

9    Q.   So can you give a sense of some of the things that are

10   still remaining for you to do as an investigator -- a

11   special agent to get a fuller picture of the conduct in this

12   case?

13   A.   To go through the electronics that were found in the

14   rental vehicle, a couple of phones and a small tablet; as

15   well as the evidence that was seized in Detroit, a couple of

16   computers, some USB, some CDs, some hard drives.

17   Q.   The notes and communications, emails, and all these

18   things that have been mentioned, do you have any evidence

19   whatsoever that the victim wanted to receive notes like

20   this?

21   A.   I do not.

22   Q.   Do you have any evidence that she wanted to be loved,

23   honored, and cherished by this defendant?

24   A.   I do not.

25   Q.   Do you have any evidence that she welcomed his

1    attentions or his efforts to patch up their relationship or

2    however he characterized it?

3    A.  I do not.

4    Q.  In fact, how does she feel right now about the

5    defendant?

6    A.  They broke up.  She does not want to reconcile.  And

7    she's very scared that he has approached her in this manner.

8              MS. BUZICKY:  No further questions, Your Honor.

9              MS. LOPEZ:  Briefly, Your Honor.

10

11                    **RECROSS-EXAMINATION**

12   **BY MS. LOPEZ:**

13   Q.  So, Agent, your testimony is that any time that

14   Mr. Thomason was in Mankato, he didn't use his personal car?

15   A.  To the two trips that he's admitted to, yes.

16   Q.  Okay.  And so if he was heading back to Rochester to

17   pick up his personal car, under your thinking wouldn't that

18   mean that he's not going back to Mankato?

19   A.  I don't know.  I just knew the reason he had to stop in

20   Rochester first was because his personal car was there.

21   Q.  Okay.  And in your investigation you've determined that

22   any time he's in his personal car he's not using that in

23   Mankato?

24             THE COURT:  I'm sorry, restate that question.

25   BY MS. LOPEZ:

1    Q.  Any time that he's gone to Mankato you've testified that

2    he uses a rental car?

3    A.  The two incidents that I'm aware of by your defendant's

4    admissions he rented a car both times to enter the City of

5    Mankato.

6    Q.  Not using his personal car in Mankato as far as you

7    know?

8    A.  That's correct, on the two.

9    Q.  Okay.  And so -- I'll stop there.

10           You talked about the investigation being ongoing.

11   But the writings that we have, those aren't going to change.

12   Those are the writings.  Correct?

13   A.  Yes, and I've just not been able to examine them each

14   individually to date.

15   Q.  And so anything that you've testified about what they

16   say, that's what they say?

17   A.  The writings, yes.

18   Q.  Okay.  Now, you were asked if Ms. Schraeder has welcomed

19   any of Mr. Thomason's efforts to be in touch with her,

20   correct?

21   A.  That's correct.

22   Q.  Isn't it true that in one of the writings, and I believe

23   this was actually stated in one of the police reports,

24   Mr. Thomason wrote something to the effect of that

25   Ms. Schraeder used to like when he would make the effort to

1    meet up with her?

2    A.  I think what you are referring to is one of the scripts

3    talked about that he likes to take the -- or she always

4    complained about him taking -- or not taking the initiative

5    to come and visit her.

6    Q.  Exactly.  So in his writing he stated that she used to

7    like when he took the initiative to come see her?

8    A.  Yeah.  That's what the statement says, yes.

9    Q.  Correct.

10   A.  It's out of context, but --

11   Q.  Thank you, Agent.

12            THE COURT:  Anything further?

13            MS. BUZICKY:  Nothing further for this witness,

14   Your Honor.

15            THE COURT:  You may be excused.

16            THE WITNESS:  Thank you, Your Honor.

17            THE COURT:  Now before the Court is the issue of

18   both probable cause and detention.  Would counsel like to be

19   heard?

20            MS. BUZICKY:  Yes, Your Honor.

21            We rest as to our presentation of evidence today.

22   So the only thing remaining would be the argument.

23            THE COURT:  Okay.  All right.  The government

24   bears the burden on both probable cause and detention, so

25   you may proceed.

1            MS. BUZICKY:  Yes, Your Honor.

2            Your Honor, the defendant is charged with one

3    count of stalking under federal law.  And under the federal

4    stalking statute as charged, it requires the government to

5    show that he traveled in interstate commerce with the intent

6    to, among other things, harass, intimidate or place under

7    surveillance another person.  If the surveillance prong is

8    indicated, the surveillance must be for the purpose of

9    physically harming, harassing or intimidating that other

10   person.  And then as a result of such travel, he engaged in

11   conduct that could have killed, injured or it would be

12   reasonably expected to cause substantial emotional distress.

13   And we submit that we have met the burden to prove that

14   there is probable cause to believe all of those elements are

15   met.

16           The question of interstate travel is basically not

17   contested in this case.  We know the defendant lives in

18   Michigan, and the evidence shows he was encountered in

19   Mankato, Minnesota.

20           He traveled in interstate commerce with the intent

21   to harass, intimidate and place the victim under

22   surveillance as evidenced by both his conduct near the

23   parking spot, which would harass and intimidate the victim,

24   and the tracking devices which placed her under

25   surveillance.

1           Finally, as a result of this travel, he engaged in

2     conduct that reasonably would be expected to cause her

3     substantial emotional distress.  As the special agent

4     testified, this woman is afraid.  She is concerned that the

5     defendant will not stop and will continue to harass and

6     intimidate her.  And she described him as very controlling

7     and motivated to accomplish these tasks because of his anger

8     that she left him.  So, Your Honor, we believe that there is

9     probable cause to bind this defendant over for further

10    proceedings in federal court.

11          With respect to the detention issue, this is not a

12    case in which there is a rebuttable presumption in favor of

13    detention, but we move for detention in this case because we

14    believe under the statute that there is a very high

15    likelihood that the defendant will be a danger to others in

16    the community and that he may leave the jurisdiction or

17    otherwise not appear for further proceedings in this case.

18          I think in this case we need to listen to the

19    voice of the victim.  She is afraid of him.  She is so

20    terrified of him that even before this got started, she did

21    not tell anyone, other than four people, that she had moved

22    to Mankato.  She had been the recipient of a bombardment of

23    emails and other communications.  She had changed her social

24    media so that he could not approach her.  And yet he still

25    found her, and he still came twice to the city where she had

1    relocated to get away from him in order to place her under

2    surveillance and then finally to see her and block her

3    vehicle in as she returned from a night at her job.

4        We have evidence here of just meticulous

5    preplanning and contemplation of this offense.  I think

6    we've all learned here today what Dynamat is.  Nobody, other

7    than someone who had an intent to cause harm, would be

8    looking into that product unless they were fully engaged in

9    an insulation project in their home.  This is an individual

10   who wrote out lists and notes.  He had handwritten what they

11   have been described as "scripts," and he clearly had an

12   intent here.

13       He had purchased supplies, whether they were

14   shelf-stable military rations or special clothing, firearms,

15   tape.  All of these items were there to facilitate his goals

16   and his plans.  There's simply no evidence that he would

17   have stopped or that he would have changed his course of

18   action because he was intent on the things that he planned

19   to do.

20       We also have evidence that he has the ability to

21   leave.  Unlike many defendants who appear before this Court,

22   he has a friend who provides him with a nearly unlimited

23   source of funds, and that kind of financial resource can

24   allow him to relocate, flee the jurisdiction, and otherwise

25   make himself unavailable for further proceedings in this

1     case.

2              So, Your Honor, we ask that the Court find that

3     there is probable cause in this matter; and that, secondly,

4     that the defendant is a danger to others in the community,

5     specifically the victim and her family, and that there is a

6     real concern that he will not appear for future proceedings

7     in this case because of his resources and ability to avoid

8     appearances in this court.

9              Thank you, Your Honor.  Unless the Court has any

10    questions, I'll conclude my remarks.

11             THE COURT:  Ms. Lopez.

12             MS. LOPEZ:  Thank you, Your Honor.

13             Your Honor, I'd submit that there's not probable

14    cause to go forward on this.  And the arguments that I'll

15    make on that issue also support my request that if the Court

16    does in fact find probable cause, that Mr. Thomason, at a

17    minimum, be allowed to go back to Michigan and that way he

18    won't even be in the same state as Ms. Schraeder, because

19    there are conditions that can reasonably assure the safety

20    of the community and that he will reappear.

21             He can certainly wear a GPS monitor as he was

22    ordered to do in state court.  And I believe there can be

23    sort of a provision where a perimeter is designated and a

24    probation officer would be notified if he crossed that.

25    Certainly the Michigan state line might be one such

1   perimeter.

2           As the government noted, this is a specific intent

3   crime, so the government has to show that Mr. Thomason had

4   intent to kill, injure, harass or intimidate Ms. Schraeder.

5   If they are proceeding under the prong that Mr. Thomason

6   placed surveillance upon her, that surveillance had to have

7   also been with the intent to kill, injure, harass or

8   intimidate that person.  And I in this case don't see how

9   the government is going to be able to do that.

10          First let's talk about Mr. Thomason's prior

11  criminal history.  He has no prior criminal history.  He has

12  no history of no-contact orders between him and

13  Ms. Schraeder, between him and past girlfriends.  He's

14  approximately 40 years old and so the lack of criminal

15  history, the lack of no-contact orders means something.

16          He's not alleged -- it's not alleged that

17  throughout the course of their relationship that there were

18  calls to 911, that he's been -- that he has had other

19  domestic issues.

20          Your Honor, this case, Mr. Thomason's sort of

21  persistence in having contact with her, as Mr. Thomason

22  stated and I believe the agent sort of knew from what he has

23  heard from other officers in this case, he was broken up

24  with via text message.  He had no closure.  And so he was

25  sort of coming back to ask her these questions.

1           What he had in his hand when he approached her was

2    not a gun, not a weapon.  He was not aggressive.  He was not

3    threatening.  He was described by her to police officers as

4    "friendly."  What he had in his hand was an envelope with

5    those questions to her, and he was hoping that she would

6    read that and answer them.

7           When he was asked to leave, he did so without

8    incident.  He wasn't seen following her again, wasn't seen

9    circling the block.  He left when he was told to.  This is

10   the only contact that they are alleging constitutes stalking

11   between Mr. Thomason and Ms. Schraeder.

12          Your Honor, I think it's significant that

13   Mr. Thomason has been arrested several times in this case

14   and that not in either incident, including the incident with

15   Ms. Schraeder's father, did he resist, did he become

16   belligerent.  His first arrest he was not even arrested in

17   the same city as Ms. Schraeder.  He was 15 miles away.  His

18   second arrest he was even farther away in what appeared to

19   be on the way back home.  He was arrested an hour and a half

20   from her home seemingly -- at least from what I understood

21   of the testimony, seemingly to pick up his car, which he has

22   never driven into Mankato, so that would suggest he was not

23   going back to Mankato but, rather, was on his way back to

24   Michigan.  I think that's significant, that Mr. Thomason was

25   doing that, was going to leave the state.

1           And related to that, I think it's significant that

2      when he was released in I want to say Blue Earth County and

3      the bail bondsman was driving him to the police station, he

4      had already had that no-contact order on him and he did his

5      best to abide by it.  He asked the bail bondsman can we

6      drive a different route so that I avoid her house.  What he

7      could have done, had he wanted to stalk her, had he wanted

8      to follow her, he could have figured I'm in a car that she

9      wouldn't know and ask the bail bondsman to go a particular

10     route to check in on her.  He didn't do that.  He tried to

11     avoid it.  So he is complying with court orders.

12          He was found wearing that GPS ankle bracelet.  It

13     did work exactly as the Court was hoping it would.  And they

14     were able to find him when they needed to find him.

15          The issue of release has been addressed in state

16     court, and the judge there found the prosecutor recommended

17     that he be released with conditions, and the judge agreed to

18     go along with that.  As a result, Mr. Thomason is under

19     conditions there.  He has a $25,000 bond that could be

20     surrendered if he doesn't appear.

21          He has a domestic abuse no-contact order there.

22     He also has a restriction to not be near her house.  He has

23     been ordered to surrender his firearms, and he has agreed to

24     do that.  He has been ordered to use no alcohol and no

25     drugs.  And he signed a waiver of extradition.  This

1       particular point about signing a waiver of extradition is

2       important because what Mr. Thomason will be told by me is

3       that if he's apprehended by state authorities first, that

4       could ultimately result -- if he's convicted in both

5       jurisdictions, it could result in a consecutive sentence if

6       he's picked up by them first and then the federal case is

7       handled second.  So I think that that is a significant

8       possibility of a punishment for Mr. Thomason.

9              And, lastly, as I've noted, he's been ordered to

10      comply with the mandates of GPS monitoring.  And what the

11      agent said is that GPS was fashioned in a particular way so

12      that it did -- he could be monitored in Michigan.

13             Your Honor, the items that were found in Michigan

14      I don't believe add very much to the risk level involved in

15      this case.  Clearly he didn't bring any of those items with

16      him.  He knew he was coming here.  If he's as meticulous as

17      the government is saying with the notes and the preparation

18      and all of that, if he intended to use any of those items,

19      he would have brought them with him.

20             Your Honor, in sum, I think that Mr. Thomason is

21      certainly heartbroken.  He certainly left without answers at

22      the end of a one-and-a-half-year relationship.  The

23      administrator says that they broke up in May, but she

24      continued to take very expensive gifts from him, which to

25      him made him believe that they were continuing on in their

1    relationship or were at least working -- continuing to work

2    on it.  Accepting a $20,000 car, calling him from Europe to

3    request financial help, taking his credit card with her,

4    asking for a return flight from Moscow to Detroit, all of

5    these things represent -- reflect that not only were they in

6    contact during that time, I think it's a very different

7    narrative to say they broke up in May and then he shows up

8    on her doorstep in December.  That's a very different

9    narrative than what was actually going on.

10         Maybe they did break up in May, but they had

11   contact all throughout the summer, including at Thanksgiving

12   when she sent him pictures of their mutual -- of their

13   mutually shared cat and gave him an update on that.  So as

14   recent as Thanksgiving, they are sort of exchanging warm

15   emails.  He comes out in December.

16         And I think what's important about that last

17   reference I made to their contacts in November, the police

18   reports say that in early November, he sent her a message

19   saying I am okay with the status of our relationship, I'm

20   okay that it's over.  And then continued contact occurs on

21   Thanksgiving from her to him where she sends him these

22   pictures of the cat.  And that's when he began re-initiating

23   contact and trying to make things work.  So, Your Honor, I

24   think that's a very different narrative than what's being

25   explained about they broke up in May and suddenly he's

1     appearing in December for some unknown reason.

2          I think it's also significant that comment that he

3     made in his writing.  He didn't write that document in

4     anticipation of litigation.  What he said in that is that

5     she always appreciated when he took the initiative to come

6     out and meet her, and that's what the December event was,

7     was he thought he was going out there to sort of show that

8     he's still interested, to make a romantic overture, and

9     that's what happened.

10         And when he was asked to leave, he did in fact

11    leave.  He didn't intimidate her.  He didn't show a gun.  He

12    didn't have it on his person so that she could see that and

13    become intimidated.  None of that happened.

14         In terms of the GPS, yeah, it's on his car, on the

15    car that he paid for, and so it's unclear exactly what he's

16    tracking there, whether it's his car or whether it's

17    Ms. Schraeder.

18         Your Honor, for all of these reasons, I'd submit

19    that there's not probable cause to go forward on a federal

20    prosecution for interstate stalking.  And this one

21    interaction that they had nothing that he did was

22    intimidating or threatening.  She described him as

23    "friendly."  He knocked on her window, didn't bang on it,

24    didn't threaten her, didn't become upset, and he walked away

25    when he was told to leave.  So, Your Honor, for those

1    reasons I'd submit that there is no probable cause.  But

2    should this Court find that there is, Mr. Thomason with his

3    40 years of having no domestic disputes, no prior criminal

4    history should at least be allowed to fight this case out of

5    custody and be allowed to return to Michigan where he would

6    be even farther away from Ms. Schraeder than if he were in

7    the state.

8              Thank you, Your Honor.

9              THE COURT:  Thank you.

10             First, as to probable cause, the Court notes that

11    the standard for probable cause is a relatively low

12    standard.  And while the defendant has proffered a number of

13    innocent reasons for his behavior, I find that the actions

14    of the defendant in terms of stalking, putting a GPS device

15    on a car that he gave to the victim could cause or would be

16    reasonably expected to cause substantial emotional distress

17    to the victim and, accordingly, I find that there is

18    probable cause here.

19             The Court has to admit that I'm quite torn on the

20    issue of detention.  It is true that Mr. Thomason has a

21    40-year history of not any criminal activity whatsoever, and

22    it is true that Mr. Thomason's stated reasons for his

23    presence in Mankato were innocent.  Nevertheless, the

24    planning, the faraday bag, the guns, all of those things are

25    circumstantial evidence, together with the soundproofing

1    materials found in Michigan are evidence of something much

2    more nefarious.  I'm not confident and don't care what a

3    state-court judge decided with respect to Mr. Thomason's

4    detention.  And, accordingly, I am ordering him detained

5    pending trial.

6         Is there anything further that we need to address

7    this morning with respect to Mr. Thomason?

8         MS. BUZICKY:  Nothing from the United States.  But

9    with the Court's permission, I'll prepare a proposed

10   detention order, Your Honor.

11        THE COURT:  Thank you, Ms. Buzicky.

12        MS. LOPEZ:  Your Honor, just for the record, my

13   understanding is the Dynamat was not found in Michigan.

14        THE COURT:  Okay.  Thank you.  We're in recess.

15        THE COURTROOM DEPUTY:  All rise.

16        (Court adjourned at 11:27 a.m.)

17             *    *    *

18        I, Debra Beauvais, certify that the foregoing is a

19   correct transcription from the audio record of the

20   proceedings in the above-entitled matter to the best of my

21   abilities.

22        Certified by:  *s/Debra Beauvais*
                          Debra Beauvais, RPR-CRR
23

24

25